EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ildefonso Torres Rodríguez, Nydia I. Santana Segarra<br><br>Recurridos<br><br>v.<br><br>Noticentro de Puerto Rico; Televicentro of Puerto Rico, LLC; WAPA Televisión, representada por el Sr. Javier Maynulet Montilla, su Compañía Aseguradora AIG Specialty Insurance Company, Yesenia Torres Figueroa, Alex Delgado y su esposa Julissa De La Cruz Cabrera y la Sociedad Legal de Gananciales compuesta por ambos, Corporación X y Richard Roe<br><br>Peticionarios | Certiorari<br><br>2022 TSPR 129<br><br>210 DPR \_\_\_\_ |

Número del Caso:  CC-2022-20

Fecha: 31 de octubre de 2022

Tribunal de Apelaciones:

     Panel IX

Abogados de la parte peticionaria:

     Lcdo. Thomas J. Trebilcock-Horan
     Lcdo. José E. Colón Rodríguez

Abogados de la parte recurrida:

     Lcdo. Francisco Sánchez Rodríguez
     Lcdo. Pablo Colón Santiago

Abogados de los *Amicus Curiae:*

     Lcdo. Manuel A. Pietrantoni
     Lcda. Melanie Pérez Rivera
     Lcdo. Roberto A. Cámara Fuertes
     Lcda. Judith Berkan
     Lcdo. Luis José Torres Asencio
     Lcdo. Steven P. Lausell Recurt
     Lcdo. Carlos F. Ramos Hernández


Materia: Sentencia del Tribunal con Opiniones de Conformidad.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ildefonso Torres Rodríguez, Nydia I. Santana Segarra<br><br>Recurridos<br><br>v.<br><br>Noticentro de Puerto Rico; Televicentro of Puerto Rico, LLC; WAPA Televisión, representada por el Sr. Javier Maynulet Montilla, su Compañía Aseguradora AIG Specialty Insurance Company, Yesenia Torres Figueroa, Alex Delgado y su esposa Julissa De La Cruz Cabrera y la Sociedad Legal de Gananciales compuesta por ambos, Corporación X y Richard Roe<br><br>Peticionarios | CC-2022-0020 |

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de octubre de 2022.

Atendido el recurso de *Certiorari* presentado por la parte peticionaria, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones. De conformidad con nuestro estado de derecho, resolvemos que le corresponde al foro primario determinar si, en efecto, la identidad de la fuente periodística es pertinente para evaluar si la información divulgada respecto al licenciado Torres Rodríguez es de naturaleza difamatoria.

De entender que la información es pertinente a la causa de acción, el foro primario deberá establecer si se configuran los requisitos de algún privilegio.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una Opinión de Conformidad a la cual se le unen el Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco. El Juez Asociado señor Colón Pérez emitió una Opinión de Conformidad a la cual se le une el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Kolthoff Caraballo no interviene. El Juez Asociado señor Feliberti Cintrón está inhibido.


Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ildefonso Torres Rodríguez, Nydia I. Santana Segarra<br><br>Recurridos<br><br>v.<br><br>Noticentro de Puerto Rico; Televicentro of Puerto Rico, LLC; WAPA Televisión, representada por el Sr. Javier Maynulet Montilla, su Compañía Aseguradora AIG Specialty Insurance Company, Yesenia Torres Figueroa, Alex Delgado y su esposa Julissa De La Cruz Cabrera y la Sociedad Legal de Gananciales compuesta por ambos, Corporación X y Richard Roe<br><br>Peticionarios | CC-2022-0020 | *Certiorari* |

**Opinión de Conformidad emitida por el Juez Asociado señor Rivera García a la cual se le unen el Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco.**

En San Juan, Puerto Rico, a 31 de octubre de 2022.

La Sentencia que hoy emite este Tribunal se encuentra intrínsecamente atada al fiel cumplimiento de las normas vigentes que regulan nuestro derecho probatorio. Dicho esto, nuestra intervención para dilucidar la controversia traída ante nuestra consideración se encuentra limitada a que la prueba solicitada cumpla con el criterio de pertinencia, presupuesto *sine qua non* para la admisibilidad, conforme a las Reglas de Evidencia, 32 LPRA Ap. VI. Por los

fundamentos que esbozo a continuación, sostengo que este Foro carece de fundamentos para ordenarle a los peticionarios la divulgación del nombre de la fuente que proveyó la información sobre el Lcdo. Ildefonso Torres Rodríguez.

En el presente caso, se nos hacía un llamado a resolver si el Tribunal de Apelaciones erró en confirmar la *Resolución* emitida por el Tribunal de Primera Instancia, la cual tuvo el efecto de denegar una moción de orden protectora presentada por el Sr. Alex Delgado Rosa (señor Delgado Rosa) y la Sra. Yesenia Torres Figueroa (señora Torres Figueroa), junto a Televicentro of Puerto Rico, LLC (WAPA TV) y otros (peticionarios). De este modo, el foro primario les ordenó que revelaran la fuente utilizada para la publicación de varios reportajes periodísticos relacionados con el Lcdo. Ildefonso Torres Rodríguez y la señora Nydia I. Santana Segarra (licenciado Torres Rodríguez, señora Santana Segara o recurridos). En ese sentido, nos solicitan una adjudicación en sus méritos que involucra dos libertades fundamentales en nuestro ordenamiento jurídico: la libertad de expresión, en su vertiente de libertad de prensa, y el derecho a la intimidad, el cual protege al individuo de ataques abusivos a su honra y reputación.

No obstante, por entender que en primer lugar se **debe auscultar la pertinencia de la identidad de la**

**fuente periodística, asunto que aún no se ha dirimido, no hay duda de que este Foro declinó correctamente el llamado a entrar hoy en los méritos de esta controversia.** Estoy conteste en que es el Tribunal de Primera Instancia, el foro idóneo para realizar el referido análisis sobre la pertinencia.

Por ello, soy de la opinión que entrar a dilucidar la controversia sustantiva sobre la divulgación de la fuente constituye un **ejercicio prematuro de nuestra jurisdicción revisora.** Es evidente, que, al realizar este análisis, **los foros revisores erraron al ordenarle a destiempo a los peticionarios la divulgación de la fuente que hizo público el memorando del 16 de abril de 2018.** En aras de contextualizar mi criterio, expongo a continuación los hechos que motivaron esta controversia.

**I**

A principios del año 2018, la Oficina del Negociado de Investigaciones Especiales (NIE) de Ponce, adscrita al Departamento de Justicia, comenzó a investigar a varios empleados de la Autoridad de Energía Eléctrica (AEE) por directrices de la entonces Secretaria de Justicia. Esto, por alegada información de que esos empleados- ilegalmente- les cobraban a los abonados por la restauración del servicio eléctrico como consecuencia del paso del Huracán María. Ante ello, la referida investigación le fue encomendada al fiscal Torres

Rodríguez, el cual posteriormente fue relevado de esas funciones.

Así las cosas, los días 16, 17 y 24 de octubre de 2018, Televicentro de Puerto Rico, a través del noticiero *Noticentro 4* de *WAPA TV,* presentó una serie de reportajes respecto a una investigación criminal contra el licenciado Torres Rodríguez. Mediante estos, adujeron que éste presuntamente le había pagado a un empleado de la AEE a cambio de recibir un trato preferencial en la conexión del servicio eléctrico luego del paso del evento atmosférico. En ese sentido, durante la transmisión de los reportajes, hicieron referencia a un **documento (Memorando)** del cual se desprendía que las acciones del licenciado Torres Rodríguez eran constitutivas de un posible incumplimiento al Código Penal y a la Ley de Ética Gubernamental, así como faltas administrativas e infracciones a los cánones de ética de la profesión de la abogacía.[1]

A la luz de ello, el 21 de enero de 2021, los recurridos incoaron una *Demanda.*[2] En virtud de esta, alegaron que los peticionarios difundieron la información aun cuando personalmente el fiscal Torres Rodríguez le

---

[1] Apéndice de los peticionarios, *Información Importante Relacionado: 2018-02-008-0046*, págs. 278-280.

[2] Apéndice de los peticionarios, *Demanda Enmendada*, págs. 389-402. La demanda original fue enmendada a los fines de incluir a la Sra. Julissa de la Cruz Cabrera como esposa del codemandado Alex Delgado Rosado, y AIG Specialty Insurance, como aseguradora de Televicentro de Puerto Rico.

informó a la reportera Yesenia Torres Figueroa sobre la falsedad de la información publicada. Añadieron, que la información difundida provocó que el licenciado Torres Rodríguez fuese investigado por el Panel Especial del Fiscal Independiente (PFEI). Explicaron, que la investigación realizada por el PFEI culminó con el archivo del caso ante la ausencia de prueba constitutiva de delito alguno.

Asimismo, esbozaron que los recurridos divulgaron la **información falsa y difamatoria con malicia real a los fines de inducir a error, crear una opinión negativa, mancillar su honor y su reputación profesional**. Por tanto, reclamaron $2,000,000.00 por concepto de daños y perjuicios, y $200,000.00 para sufragar los gastos y honorarios de abogado. Por su parte, los recurridos presentaron una *Contestación a Demanda Enmendada*.[3] En esencia, estos plantearon que estaban relevados de responsabilidad legal porque la información era cierta, y a su vez, les cobijaba el privilegio de reporte justo y verdadero.

Así pues, iniciado el descubrimiento de prueba, el licenciado Torres Rodríguez le cursó al señor Delgado Rosado un *Interrogatorio*.[4] En lo que nos atañe, el señor Delgado Rosado indicó que recibió una carta fechada el 16

---

[3] Apéndice de los peticionarios, *Contestación a Demanda Enmendada*, págs. 265-372, 373-377, 378-385.
[4] Apéndice de los peticionarios, *Contestación a Interrogatorio*, págs. 143-165.

de abril de 2018, suscrita por el Sr. Walker K. Maldonado Sánchez, Agente Especial II del NIE, que dio base al inicio de la investigación que culminó con los reportajes. Consecuentemente, el licenciado Torres Rodríguez **le requirió al interrogado que revelara la identidad de la persona que le suplió la carta y este último se negó a divulgar esa información**. A su vez, el señor Delgado Rosado adujo que su denegatoria obedeció a un acuerdo de **confidencialidad.**

Por consiguiente, ante esta negativa, el 13 de mayo de 2021, el licenciado Torres Rodríguez presentó una *Moción para compeler contestaciones al descubrimiento al amparo de la Regla 34.2 de Procedimiento Civil*. En esencia, le solicitó al foro primario que le ordenara al señor Delgado Rosado descubrir la prueba solicitada. Por su parte, el 7 de junio de 2021, este último presentó una *Solicitud de Orden Protectora* con el fin de que se le eximiera de proveer la identidad de la fuente que facilitó la información.[5] En específico, apuntó que por ser la carta objeto de controversia un documento público, la divulgación sobre la identidad de la persona que la proveyó se encontraba protegida por el privilegio del reporte justo y verdadero.

---

[5] Apéndice de los peticionarios, *Solicitud de Orden Protectora*, págs. 329-338.

Por otro lado, el licenciado Torres Rodríguez presentó una *Oposición a: Solicitud de Orden Protectora,* en virtud de cual argumentó que el memorando no era un documento público.[6] En lo que nos concierne, adujo que por la confidencialidad que le cobija, el acto de que se le entregara a un tercero copia de éste era constitutivo de delito grave. Asimismo, nuevamente, expuso que a los peticionarios no les cobijaba la protección del privilegio antes mencionado. Así las cosas, razonó que el señor Delgado Rosado no podía negarse a descubrir la identidad de la fuente según le fuese solicitado.

Luego de varios trámites, el 11 de agosto de 2021, el Tribunal de Primera Instancia emitió una *Resolución*.[7] Mediante ese dictamen, proveyó *ha lugar* a la *Oposición a: Solicitud de Orden Protectora* presentada por los recurridos. En esencia, determinó que el memorando del Negociado de Investigaciones Especiales del Departamento de Seguridad Pública era un **documento confidencial, el cual formaba parte del sumario fiscal**. En ese sentido, concluyó que el privilegio del reporte justo y verdadero invocado por los peticionarios **no le es de aplicación** a la divulgación de un memorando confidencial de un sumario fiscal sobre una investigación en curso. De este modo, razonó que la referida defensa **sólo debe extenderse a la**

---

[6] Apéndice de los peticionarios, *Oposición a: Solicitud de Orden Protectora*, págs. 265-277.
[7] Apéndice de los peticionarios, *Resolución*, págs. 113-150.

**publicación de información que surja de procedimientos públicos, o de documentos o informes oficiales preparados en ocasión de documentos públicos y que puedan estar sujetos a la inspección del público en general.** En vista de ese análisis, el **foro primario ordenó a los peticionarios divulgar la fuente del memorando del 16 de abril de 2018.**

En desacuerdo con el dictamen del foro primario, el 27 de septiembre de 2021, los peticionarios instaron un recurso de *Certiorari* ante el Tribunal de Apelaciones.[8] En apretada síntesis, reiteraron sus argumentos sobre la protección que a su entender les cobija bajo el privilegio antes mencionado. Asimismo, expusieron que, de la *Resolución* dictada por el Tribunal de Primera Instancia, no se desprende que hubiese realizado un análisis sobre el balance de intereses entre los recurridos y la prensa. Al respecto, **argumentaron que el foro primario no ponderó los siguientes criterios:** (i) el contenido falso de los reportajes vistos a la luz de la carta, (ii) qué otras fuentes de información han agotado para intentar conseguir la identidad de la fuente del compareciente y, (iii) **la relevancia de su identidad para adelantar su reclamación.**[9]

---

[8] Apéndice de los peticionarios, *Recurso de certiorari Civil*, págs. 75-97.
[9] Íd., pág. 81.

Así pues, examinadas las posturas de ambas partes,[10] el 18 de noviembre de 2021, el Tribunal de Apelaciones emitió una *Sentencia* y confirmó el dictamen del foro primario.[11] En específico, le ordenó al señor Delgado Rosado a divulgar la identidad de la fuente. De este modo, el foro intermedio determinó que se debía cumplir con lo siguiente: (1) que el reporte fuese justo en cuanto al objeto de la información, y (2) que lo publicado fuese cierto y reflejara sustancialmente lo expresado o acontecido. Asimismo, expuso que el descubrimiento de prueba se encontraba limitado a que (1) lo que se pretenda descubrir no fuese materia privilegiada; y (2) **que fuese pertinente al asunto en controversia**. De igual modo, resaltó que la información brindada debe reflejar lo acontecido en reportes, procedimientos o acciones **públicas** y oficiales de las agencias gubernamentales.

Consecuentemente, el foro intermedio concluyó que los peticionarios intentaron justificar su derecho a la libertad de prensa sobre un **documento interno de una agencia gubernamental el cual formaba parte de una investigación criminal en curso**. Por lo cual, afirmó que el memorando interno no se encuentra protegido por el privilegio del reporte justo y verdadero.

---

[10] Apéndice de los peticionarios, *Alegato en Oposición a Petición de certiorari*, págs. 37-68.

[11] Apéndice de los peticionarios, *Sentencia*, págs. 19-36.

Inconforme aún, el 10 de enero de 2022, los peticionarios acudieron ante nos mediante un recurso de *Certiorari*. En su petitorio, presentaron los señalamientos de errores siguientes:

> Incidió el [Honorable Tribunal de Apelaciones] al confirmar la resolución que declaró sin lugar la orden protectora solicitada por el Sr. Delgado Rosado dirigida a impedir que divulgue la identidad de su fuente confidencial que le entregó, bajo acuerdo de confidencialidad, copia de la carta de 16 de abril de 2018, sin haber realizado análisis alguno sobre el balance de los derechos y obligaciones del demandante-recurrido *vis-a-vis* la prensa.

> Incidió el [Honorable Tribunal de Apelaciones] al confirmar la resolución que determinó que el privilegio de "fair report" no es extensivo al caso que aquí nos ocupa debido a que el documento objeto de la controversia no era de libre acceso al público en general.

El 18 de marzo de 2022 este Foro expidió el auto.[12] Así pues, perfeccionado el recurso ante nuestra consideración, y contando con el beneficio de la comparecencia de ambas partes, procedo a exponer mi postura.

---

[12] Atendida la *Moción del Centro de Periodismo Investigativo para comparecer en calidad de Amicus Curiae para apoyar la expedición del auto de Certiorari* presentada el 25 de febrero de 2022, este Tribunal proveyó *ha lugar* en virtud de la *Resolución* emitida el 18 de marzo de 2022. Posteriormente, el 23 de mayo de 2022, Publi-Inversiones Puerto Rico (que publica El Vocero), Teleonce TV, Telemundo de Puerto Rico, Inc., Uno Radio Group, y GFR Media, LLC, presentaron una *Solicitud para comparecer como Amicus Curiae*, a la cual se le proveyó *ha lugar* mediante *Resolución* emitida el 31 de mayo de 2022.

# II

## A.   Descubrimiento de prueba

Hemos reiterado que son los **foros primarios** quienes gozan de amplia discreción para regular el descubrimiento de prueba.[13] En ese sentido, este resulta ser un proceso amplio y liberal.[14] Asimismo, su importancia surge con el fin de que el proceso sea uno de mayor flexibilidad, mediante el cual prospere una mayor cooperación entre las partes.[15] Cónsono con ello, la Regla 23.1 (a) de las de Procedimiento Civil dispone lo siguiente:

> [l]as partes podrán hacer descubrimiento sobre cualquier materia, **no privilegiada, que sea pertinente al asunto en controversia en el pleito pendiente,** ya se refiera a la reclamación o defensa de cualquier otra parte, incluso la existencia, descripción, naturaleza, custodia, condición y localización de cualesquiera libros, información almacenada electrónicamente, documentos u otros objetos tangibles, y la identidad y dirección de personas que conozcan hechos pertinentes. No constituirá objeción el que la información solicitada sea inadmisible en el juicio, siempre que exista una probabilidad razonable de que dicha información conduzca al descubrimiento de evidencia admisible.[16] (Énfasis nuestro).

En ese contexto, resaltamos que la materia objeto de descubrimiento de prueba se encuentra limitada por (1) su **pertinencia,** y (2) por la existencia de un privilegio

---

[13] *McNeil Healthcare, LLC v. Municipio de Las Piedras*, 206 DPR 659,672 (2021).
[14] Íd.
[15] Íd., pág. 673.
[16] 32 LPRA Ap. V, R. 23.1 (a).

reconocido.[17] Por ello, somos enfáticos en que su admisibilidad dependerá del cumplimiento de los factores antes esbozados.[18] De este modo, la **pertinencia** se determinará al considerar los factores siguientes:

> [...] (a) prueba que sea admisible en el juicio; (b) hechos que puedan servir para descubrir evidencia admisible; (c) datos que puedan facilitar el desarrollo del proceso; (d) admisiones que puedan limitar las cuestiones realmente litigiosas entre las partes; (e) datos que puedan servir para impugnar la credibilidad de los testigos; (f) hechos que puedan usarse para contrainterrogar a los testigos de la otra parte; (g) nombres de los testigos que la parte interrogada espera utilizar en el juicio.[19]

De igual modo, también se encuentra excluida de descubrimiento, materia que sea privilegiada acorde a las Reglas de Evidencia, 32 LPRA Ap. VI, según apliquen.

### B. Pertinencia

La Regla 401 de Evidencia define la **evidencia pertinente** como "aquella que tiende a hacer la existencia de un hecho, **que tiene consecuencias para la adjudicación de la acción**, más probable o menos probable de lo que sería sin tal evidencia".[20] En ese sentido, evidencia pertinente es aquella que es capaz de arrojar luz o tiene **algún valor probatorio**, por mínimo que sea, para la

---

[17] *McNeil Healthcare, LLC v. Municipio de Las Piedras*, supra, pág. 673.

[18] *Rosado Reyes v. Global Healthcare Group, LLC*, 205 DPR 796, 811-12 (2020); Regla 401 de Evidencia, 32 LPRA Ap. VI.

[19] *McNeil Healthcare, LLC v. Municipio de Las Piedras*, supra, pág. 674.

[20] 32 LPRA Ap. VI, R. 401.

**adjudicación de la acción.**[21] Además, esta se encuentra atada al derecho sustantivo aplicable al caso.[22] Al respecto, cabe resaltar que la admisibilidad de la evidencia depende inexcusablemente de que esta sea pertinente.[23] Por lo cual, de ser pertinente es *prima facie* admisible. No obstante, "la evidencia no pertinente es inadmisible".[24]

### C. Acción de daños por difamación

Nuestra Carta Magna provee una protección expresa contra ataques abusivos a la honra y reputación de una persona.[25] Por ello, hemos conceptuado la difamación como la intención que se deriva del acto de desacreditar a una persona mediante la publicación de información falsa contra su prestigio, fama o reputación.[26] Asimismo, hemos señalado que esta abarca los términos de libelo y calumnia.[27] Por consiguiente, hacemos énfasis en que los casos de difamación conllevan un riguroso balance de intereses.[28] En ese sentido, esta causa de acción desemboca en "la difícil tarea de balancear el alcance de la **libertad de expresión y el derecho a la intimidad,** ambos valores reconocidos como de alta jerarquía y de

---

[21] Reglas de Evidencia Comentadas, *Ernesto L. Chiesa Aponte*, págs. 71-72 (2016).
[22] Íd.
[23] Íd., 73.
[24] Íd., 74; 32 LPRA Ap. VI, R. 402.
[25] *Meléndez Vega v. El Vocero de PR,* 189 DPR 123, 147 (2013); Art. II, sec. 8, Const. E.L.A., LPRA, Tomo 1.
[26] *Krans Bell v. Santarrosa*, 172 DPR 731, 741 (2007).
[27] Íd., 742.
[28] *Meléndez Vega v. El Vocero de PR*, supra, pág. 147.

interés público en nuestro ordenamiento jurídico".[29] Por un lado, "comprende el interés del Pueblo en fomentar el debate vigoroso sobre cuestiones de interés público",[30] y por el otro, el derecho a la intimidad de los individuos.

Cónsono con lo anterior, "la doctrina de difamación se divide en dos vertientes, cada una con sus respectivas exigencias constitucionales, según la clasificación del demandante como **funcionario o figura pública, o como persona privada**".[31] Así pues, para que prospere una acción civil por libelo o difamación, siendo el promovente un **funcionario público o figura pública**, deberá demostrar "que la expresión difamatoria es falsa, que se publicó a sabiendas de que era falsa o con grave menosprecio de su falsedad o veracidad, es decir, con malicia real, y que dicha publicación le causó daños reales".[32] Por ello, el promovente tiene que probar la malicia real de manera clara, robusta y convincente.[33]

Ahora bien, de tratarse sobre una **persona privada**, el estándar de prueba es uno menor al exigido si fuese una figura pública.[34] De este modo, respecto a una persona privada, hemos señalado que lo que se exige es que la

---

[29] Íd.

[30] *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 795 (2020).

[31] *Meléndez Vega v. El Vocero de PR*, supra, pág. 147.

[32] *Gómez Márquez et al. v. El Oriental,* supra, pág. 796; *Meléndez Vega v. El Vocero de PR,* supra, pág. 148.

[33] *Meléndez Vega v. El Vocero de PR,* supra, pág. 149.

[34] *Gómez Márquez et al. v. El Oriental,* supra, pág. 796.

actuación del demandado sea negligente.[35] A esos fines, establecimos los criterios que un tribunal debe ponderar para determinar si el demandado incurrió en negligencia, a saber, los siguientes:

> (1) la naturaleza de la información publicada y la importancia del asunto sobre el cual trata, especialmente si la información es libelosa de su faz y puede preverse el riesgo de daño; (2) el origen de la información y la confiabilidad de su fuente, y (3) la razonabilidad del cotejo de la veracidad de la información, lo cual se determina tomando en consideración el costo en términos de dinero, tiempo, personal, la urgencia de la publicación, el carácter de la noticia y cualquier otro factor pertinente.[36]

## III

En el presente caso, los peticionarios aducen que tienen derecho a invocar el privilegio del periodista, y que, a su vez, las publicaciones vertidas, que motivan este pleito, se encuentran protegidas por el aludido privilegio. A su entender, ese privilegio les permite negarse a divulgar la fuente de la información publicada. Asimismo, expresaron que los recurridos fallaron en **demostrar la pertinencia de la identidad de la fuente para adelantar su reclamación por difamación**. Por tanto, expusieron que el privilegio del informe justo y verdadero es invocable aun presumiendo que la información fuera falsa.

---

[35] Íd., 804.
[36] Íd., 806.

Por otro lado, los recurridos arguyeron que la información periodística utilizada fue precisamente un **memorando confidencial producto del sumario fiscal de una investigación pendiente en curso.** En ese sentido, apuntillaron que la **información no estaba disponible a la comunidad, por ser esta una privilegiada.** Asimismo, hicieron hincapié en que precisamente la Regla 95 de las de Procedimiento Criminal, 34 LPRA Ap. II, expresamente prohíbe el descubrimiento de prueba sobre documentos de esta naturaleza. Por tanto, concluyeron que los peticionarios no eran acreedores de la protección del privilegio del informe justo y verdadero. Esto, en la medida en que la información fue adquirida de manera ilegal, y, por ende, representa una actuación constitutiva de delito.

En lo que nos concierne, cabe resaltar que el origen de la reclamación en cuestión estriba sobre una **causa de acción de daños por difamación como consecuencia de los reportajes difundidos.** Evidentemente, esto se fundamenta en la contención de que la información revelada era falsa. Como parte de este proceso, el foro primario, así como el Tribunal Apelativo, concluyeron que procedía la divulgación de la identidad de la fuente que, les suministró a los periodistas el memorando. Sin embargo, en el presente caso -como en cualquier otro- la admisibilidad de la evidencia a descubrirse estará

vinculada a cuán **pertinente sea esta para la adjudicación de la acción. Es decir, cuan útil sea para demostrar si en efecto existe probabilidad de que los peticionarios hayan incurrido en falsedad al divulgar los reportajes.** A esos efectos, resulta inescapable en este caso, concluir que, la evidencia pertinente debe ser aquella que ayude al juzgador a analizar si se configuraron los requisitos de una **causa de acción de daños por difamación.**

A la luz de estas consideraciones, sostengo que- en esta etapa- este Foro se encuentra ante un **análisis incompleto, específicamente carente de una evaluación sobre la pertinencia de la identidad de la fuente periodística.** En consecuencia, no estamos en posición de aún requerir o denegar la divulgación de la identidad. De conformidad con el estado de derecho, le corresponde al foro primario evaluar si en efecto, ese dato es pertinente para concluir que la información divulgada contra el licenciado Torres Rodríguez era falsa, y que estaba cobijada o no bajo algún privilegio. **Resolver lo contrario, implicaría un ejercicio prematuro de nuestra facultad revisora.**

Por los fundamentos que anteceden, me encuentro conteste con la Sentencia que hoy emite este Tribunal, a los fines que el caso sea devuelto al Tribunal de Primera Instancia para que proceda a determinar la pertinencia de la identidad de la fuente, conforme a los criterios

jurídicos enunciados. En fin, las determinaciones de los foros revisores constituyen una actuación prematura y errónea en derecho.




                                        Edgardo Rivera García
                                            Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Idelfonso Torres Rodríguez, Nydia I. Santana Segarra<br><br>    Recurridos<br><br>        v.<br><br>Noticentro de Puerto Rico; Televicentro of Puerto Rico, LLC; WAPA Televisión, representada por el Sr. Javier Maynulet Montilla, su Compañía Aseguradora AIG Specialty Insurance Company, Yesenia Torres Figueroa, Alex Delgado y su esposa Julissa De La Cruz Cabrera y la Sociedad Legal de Gananciales compuesta por ambos, Corporación X y Richard Roe<br><br>    Peticionarios | CC-2022-0020 | *Certiorari* |

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ a la cual se une el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 31 de octubre de 2022.

> **Se trata, pues, de asegurar el "proceso de comunicación necesario para que una democracia sobreviva".[1]**

Si bien estamos conformes con la *Sentencia* que hoy emite este Tribunal, la cual correctamente revoca los dictámenes emitidos por los foros *a quo*,[2] emprendemos la tarea de escribir estas breves líneas toda vez que consideramos que

---

[1] *Soto v. Srio. de Justicia*, 112 DPR 477, 492 (1982).

[2] Ello, por considerar que los foros revisores erraron al ordenarles a los peticionarios, Noticentro de Puerto Rico *et al.*, revelar la identidad de determinada fuente confidencial que le suministró cierto documento gubernamental a base del cual publicaron una serie de reportajes televisivos.

ésta resultaba ser la ocasión perfecta para: 1) reconocer en nuestra jurisdicción el **privilegio del periodista** de manera cualificada; 2) diferenciarlo del privilegio del reporte justo y verdadero prescrito en la Ley de Libelo y Calumnia, *infra*, y 3) aclarar el alcance de este último; ello, frente a un reclamo de descubrimiento de prueba en una acción civil sobre difamación en la cual estaba en controversia si ciertos periodistas podían válidamente negarse a revelar la identidad de la fuente confidencial que le suministró determinado documento gubernamental a base del cual publicaron una serie de reportajes televisivos. Nos explicamos.

                                 I.

    Los hechos medulares que dieron origen a la causa de epígrafe no están en controversia. El 21 de enero de 2021, el Sr. Idelfonso Torres Rodríguez junto a su esposa, la Sra. Nydia I. Santana Segarra (en adelante, "licenciado Torres Rodríguez") instaron una *Demanda Enmendada* sobre difamación y daños y perjuicios en contra de Televicentro of Puerto Rico, LLC y/o WAPA Televisión (en adelante, "WAPA TV"), la Sra. Yesenia Torres Figueroa, el Sr. Alex Delgado Rosado (en adelante, "señor Delgado Rosado"), entre otros (en conjunto, "los periodistas" o "peticionarios").[3]

    En apretado resumen, el licenciado Torres Rodríguez señaló que, durante los días 16, 17 y 24 de octubre de 2018, los peticionarios publicaron una serie de reportajes

---

[3] La *Demanda* original se presentó el 16 de octubre de 2019.

televisivos relacionados con cierta investigación que le implicaba, cuando éste se desempeñaba como Fiscal Auxiliar IV. Ello, por el licenciado Torres Rodríguez presuntamente haber pagado a empleados de la Autoridad de Energía Eléctrica (AEE) para recibir un trato preferencial en la conexión del servicio eléctrico tras el paso de determinados huracanes por la Isla en el año 2017. Al respecto, adujo que, aun cuando advirtió a los periodistas -- aquí peticionarios -- que la información suministrada era falsa, incorrecta y libelosa, ésta fue publicada.

Asimismo, el licenciado Torres Rodríguez sostuvo que la serie de reportajes provocó que la Oficina del Panel sobre el Fiscal Especial Independiente y la Oficina de Ética Gubernamental iniciaran una investigación en su contra, y que la imagen de éste se viese afectada al exponerlo al ojo público. Consecuentemente, reclamó la cantidad de dos millones de dólares ($2,000,000.00) por los daños sufridos a raíz de la publicación de los mencionados reportajes televisivos, más una suma no menor a doscientos mil dólares ($200,000.00) por concepto de gastos y honorarios de abogado.

Enterados de lo anterior, los periodistas presentaron sus respectivas contestaciones. En esencia, negaron las alegaciones en su contra, aseguraron que la información difundida era cierta y, entre otras defensas afirmativas, adujeron que las expresiones vertidas en los reportajes televisivos estaban cobijadas por el privilegio del reportaje

justo y verdadero al amparo de la Ley de Calumnia y Libelo, *infra*, y por la libertad de prensa protegida constitucionalmente, lo que les eximía de responsabilidad legal.

Así las cosas, las partes involucradas en el presente litigio iniciaron el descubrimiento de prueba. Sin embargo, durante ese proceso se suscitaron varias controversias.

Particularmente, el 13 de mayo de 2021 el licenciado Torres Rodríguez presentó una *Moción para compeler contestaciones al descubrimiento al amparo de la Regla 34.2 de Procedimiento Civil*, 32 LPRA Ap. V, R. 34.2. En lo pertinente, solicitó al foro primario que ordenara al señor Delgado Rosado -- uno de los periodistas aquí peticionarios -- a descubrir la identidad de la fuente confidencial que le facilitó una carta con fecha de 16 de abril de 2018, suscrita por un agente del Negociado de Investigaciones Especiales del Departamento de Justicia y que fue divulgada en los reportajes televisivos objeto de la demanda de epígrafe, por contener información relacionada con la investigación que implicaba al licenciado Torres Rodríguez.

En respuesta, el 7 de junio de 2021 el señor Delgado Rosado y WAPA TV presentaron, conjuntamente, una *Solicitud de Orden Protectora* al amparo de las Reglas 23.2 y 34.1 de Procedimiento Civil, 32 LPRA Ap. V., R. 23.2 y R. 34.1. **En suma, requirieron que, en virtud del privilegio del**

**periodista, se les eximiera de responder las preguntas sobre la identidad de la fuente confidencial en cuestión.**

Al respecto, los periodistas arguyeron que obligarles a descubrir la referida fuente contravendría su derecho a la libertad de prensa, toda vez que el acuerdo de confidencialidad con ésta (la fuente) es un elemento necesario y común para el ejercicio de ese derecho, en particular, su derecho a recibir información. Además, argumentaron que en el caso de marras no era necesario descubrir la fuente confidencial, pues en los reportajes televisivos sólo se había publicado lo ocurrido lo cual estaba protegido en virtud del privilegio del reporte justo y verdadero, por lo que la causa de acción en su contra era improcedente.

Por su parte, el 28 de junio de 2021 el licenciado Torres Rodríguez se opuso a la petición de orden protectora. Específicamente, alegó que la carta con fecha de 16 de abril de 2018 era un memorando de inhibición de una investigación criminal activa que formaba parte de un sumario fiscal, el cual era confidencial y no estaba disponible al examen público.

Sobre ello, el licenciado Torres Rodríguez añadió que el acto de entregar una copia de dicho memorando a un tercero era un delito grave tipificado en nuestro ordenamiento jurídico. En ese sentido, la parte recurrida sostuvo que, por tratarse de un documento con información confidencial, los

periodistas no podían ampararse en el privilegio del reporte justo y verdadero para rehusarse a descubrir la identidad de la persona que lo suministró y, con ello, encubrir la comisión de un delito.

En consideración a lo antes dicho, el 27 de julio de 2021 los periodistas replicaron. En su escrito, destacaron que podían negarse a responder a la petición de descubrir la identidad de la fuente confidencial en virtud del privilegio del periodista, según reconocido en la jurisprudencia federal y en nuestro derecho constitucional.

Igualmente, los periodistas insistieron en que, si bien el memorando en cuestión era un documento gubernamental, lo expresado en los reportajes televisivos estaba protegido por el privilegio del reporte justo y verdadero. El licenciado Torres Rodríguez duplicó.

Evaluados los escritos de ambas partes, el 11 de agosto de 2021 el Tribunal de Primera Instancia emitió una *Resolución*. Mediante ésta, dicho foro declaró sin lugar la moción de orden protectora de los peticionarios.

El foro primario fundamentó su determinación en que la carta o memorando de 16 de abril de 2018 era un documento confidencial que formaba parte de un sumario fiscal de una investigación en curso para la cual no aplicaba el privilegio del reporte justo y verdadero. Con ello, ordenó a los periodistas a descubrir la identidad de la fuente confidencial que suministró la referida carta a la prensa.

Los periodistas solicitaron al Tribunal de Primera Instancia la reconsideración de lo dictaminado. No obstante, la petición de referencia fue denegada.

Inconformes con la determinación del foro primario, el 27 de septiembre de 2021 los periodistas acudieron al Tribunal de Apelaciones mediante un recurso de *certiorari*. Allí, señalaron que el Tribunal de Primera Instancia había errado al declarar sin lugar la orden protectora y al no considerar la aplicación del privilegio del periodista a la luz del derecho constitucional a la libertad de palabra y de prensa.

Sobre el particular, esgrimieron que, de las propias comparecencias del licenciado Torres Rodríguez, surgía que, como condición para que el tribunal ordenara revelar la identidad de la fuente confidencial que proveyó el documento, la parte que interesaba el descubrimiento debía probar primero: 1) el contenido falso de los reportajes a la luz de la referida carta; 2) que entrevistaron a otros testigos o que agotaron otros medios para identificar la fuente, y 3) la relevancia de la identidad de la fuente para adelantar la reclamación en cuestión.[4] Por igual, subrayaron que el foro primario había incidido al concluir que el privilegio del reporte justo y verdadero no aplicaba al caso de autos.

Oportunamente, el licenciado Torres Rodríguez se opuso. En resumen, repitió los argumentos esbozados ante el Tribunal de Primera Instancia respecto a que la carta de referencia

---

[4] Véase, Apéndice del *certiorari*, págs. 81 y 89.

era un documento confidencial que no estaba protegido por el privilegio del reporte justo y verdadero. Razón, por la cual, a su modo de ver, debía compelerse a los peticionarios a descubrir la fuente confidencial.

Tras examinar los alegatos de las partes, el 8 de noviembre de 2021 el foro apelativo intermedio emitió una *Sentencia* mediante la cual confirmó el dictamen recurrido. Al así hacerlo, dicho foro razonó, -- según propuso el licenciado Torres Rodríguez --, que, por tratarse de un documento interno de una agencia de gobierno que formaba parte de un sumario fiscal y que no estaba sujeto al escrutinio público, los periodistas no podían negarse a identificar la fuente confidencial que lo compartió, ya que no aplicaba el privilegio del reporte justo y verdadero.

En desacuerdo, los periodistas solicitaron la reconsideración del referido dictamen. Entre otros argumentos, éstos aseveraron que el Tribunal de Apelaciones ignoró la independencia de los privilegios reclamados. **A tenor con ello, adujeron que ese foro no consideró la extensa jurisprudencia federal que reconoce el privilegio del periodista, como corolario del derecho constitucional a la libertad de prensa, para relevarles de descubrir la identidad de su fuente confidencial en un pleito civil de difamación.** No obstante, dicha petición fue denegada.

Aún insatisfechos con el proceder del foro apelativo intermedio, el 10 de enero de 2022 los periodistas recurrieron

ante nos mediante una petición de *certiorari*. En suma, indicaron que el Tribunal de Apelaciones erró al confirmar el dictamen emitido por el Tribunal de Primera Instancia sin haber realizado un análisis de balance entre los derechos de las partes involucradas en el presente litigio, así como al afirmar que el privilegio del reporte justo y verdadero no era extensivo al caso de epígrafe. El 18 de marzo de 2022, decidimos expedir la presente controversia.

Asimismo, mediante resoluciones emitidas el 18 de marzo de 2022 y el 31 de mayo de 2022, declaramos con lugar las peticiones de *Amicus Curiae* presentadas por el Centro de Periodismo Investigativo y Publi-Inversiones Puerto Rico, Inc. (que publica El Vocero), Teleonce TV, Telemundo de Puerto Rico, Inc., Uno Radio Group y GFR Media, LLC, respectivamente. **En apretada síntesis, ambas comparecencias sostuvieron que este Tribunal debía reconocer el privilegio del periodista por imperativo constitucional y, a su vez, aplicarlo en el presente litigio.**

Al acercarnos a la controversia ante nuestra consideración, y en aras de lograr un consenso sobre la forma de disponer de los asuntos ante nos, hoy este Tribunal revoca la *Sentencia* emitida por los foros *a quo*. En consecuencia, devuelve el caso de epígrafe al Tribunal de Primera Instancia para que dicho foro determine si, en efecto, la identidad de la fuente periodística es pertinente para evaluar si la información divulgada -- respecto al licenciado Torres

Rodríguez -- es de naturaleza difamatoria. **Así, y de dicho foro entender que la información es pertinente a la causa de acción, el Tribunal de Primera Instancia deberá considerar la aplicabilidad de algún privilegio.**

Sobre esto último, -- y del foro primario emprender dicha tarea --, a nuestro juicio, el único privilegio que debe ser reconocido en el caso de marras, es: **el privilegio del periodista**. Ahí el porqué de esta Opinión de Conformidad. Nos explicamos.

## II.

Como es sabido, el Artículo II, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico, -- al establecer que no se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios --, consagra el derecho fundamental a la libertad de expresión de toda persona que en este País habita. Art. II, Sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 290. Véase, también, *OCS v. Point Guard Ins.*, 205 DPR 1005, 1018 (2020); *E.L.A. v. Northwestern Selecta*, 185 DPR 40, 61-62 (2012); *U.P.R. v. Laborde Torres y otros I*, 180 DPR 253, 286 (2010). De los comentarios realizados a la precitada protección constitucional en el Diario de Sesiones de la Convención Constituyente, surge que los derechos allí consagrados -- junto a los descritos en la Sección 3 del mencionado artículo -- cubren "el ámbito general de la

libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud[,] dentro de la más dilatada libertad[,] la totalidad de los derechos". 4 Diario de Sesiones de la Convención Constituyente 2564 (2003). Véase, también, *OCS v. Point Guard Ins.*, *supra*, pág. 1019; *U.P.R. v. Laborde Torres y otros I*, *supra*; *Muñiz v. Admor. Deporte Hípico*, 156 DPR 18, 23 (2002).[5]

Cónsono con lo anterior, en reiteradas ocasiones hemos expresado que la libertad de palabra y de prensa surgen como piedra angular de nuestro sistema democrático de gobierno, en la medida en que "[faculta] el desarrollo del individuo y [estimula] el libre intercambio y la diversidad de ideas". *OCS v. Point Guard Ins.*, *supra*; *U.P.R. v. Laborde Torres y otros I*, *supra*; *Muñiz v. Admor. Deporte Hípico*, *supra*. Por esa razón, la libertad de expresión "[d]e forma multidimensional, en las constelaciones de valores democráticos, goza de primacía peculiar" en nuestro ordenamiento jurídico. *U.P.R. v. Laborde Torres y otros I*, *supra*.

De ahí que, cuando nos enfrentamos a controversias en materia de libertad de palabra o de prensa, es nuestro deber rechazar atenderlas en un vacío. Por el contrario, estamos llamados a resguardar celosamente las protecciones de estos derechos, por su valor de la más alta jerarquía

---

[5] "El ideal de una verdadera democracia como desiderátum en que se inspira nuestra Constitución concibe la libertad de palabra, de prensa, de reunión pacífica y de pedir al gobierno la reparación de agravios 'dentro de la más dilatada' visión". *Soto v. Srio. de Justicia*, *supra*, pág. 485.

constitucional. *OCS v. Point Guard Ins.*, *supra*; *U.P.R. v. Laborde Torres y otros I*, *supra*; *Muñiz v. Admor. Deporte Hípico*, *supra*.

Claro está, lo anterior conscientes de que el derecho de libertad de palabra y de prensa no es absoluto, ya que éste "puede subordinarse a otros intereses cuando la necesidad y conveniencia pública lo requieran". *OCS v. Point Guard Ins.*, *supra*; *U.P.R. v. Laborde Torres y otros I*, supra; *Asoc. de Maestros v. Srio. de Educación*, 156 DPR 754, 768 (2002). En ese sentido, subrayamos que, aunque el derecho a la libertad de palabra y de prensa queda sujeto a la imposición de limitaciones, la interpretación de estas últimas se hará restrictivamente, "de manera que no abarquen más de lo necesario". *OCS v. Point Guard Ins.*, *supra*.

En ese sentido, en el contexto particular de la libertad de prensa, huelga señalar que, como corolario de ella, este Foro ha reconocido el *derecho de acceso,* el *derecho de recopilar y* el *derecho a publicar* como herramientas claves para el libre flujo de información, intercambio de ideas y el ejercicio eficaz del referido derecho constitucional. Véase, por ejemplo, *Disidente Univ. de P.R. v. Depto. de Estado*, 145 DPR 689 (1998); *Villanueva v. Hernández Class*, 128 DPR 618 (1991); *Soto v. Srio. de Justicia*, 112 DPR 477 (1982); *Caraballo v. Puerto Rico Ilustrado, Inc.*, 70 DPR 283 (1949). Se trata, en definitiva, de asegurar el "proceso de

comunicación necesario para que una democracia sobreviva". *Soto v. Srio. de Justicia*, *supra*, pág. 492.

Dicho ello, es menester recordar que los derechos reconocidos en el Artículo II, Sección 4, de nuestra Carta Magna, *supra*, "encuentra[n] su origen en los postulados de la Primera Enmienda de la Constitución de los Estados Unidos de América". Véase, J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. UPR, 2012, Vol. III, pág. 181. En lo aquí pertinente, la enmienda constitucional a la que hemos hecho referencia postula que "[e]l Congreso no aprobará ninguna ley […] que coarte la libertad de palabra o prensa".[6] Emda. I, Const. EE. UU., LPRA, Tomo 1, ed. 2016, pág. 182.

En consecuencia, es norma harto conocida que, al momento de atender controversias en materia de derecho de libertad de palabra y de prensa, adoptemos las interpretaciones que los foros federales han empleado al respecto. *OCS v. Point Guard Ins.*, *supra*; *U.P.R. v. Laborde Torres y otros I*, *supra*; *Muñiz v. Admor. Deporte Hípico*, *supra*. Véase, también, R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. PR, 1988, Vol. II, pág. 1278. Así, en las próximas páginas, lo haremos.

---

[6] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; **or abridging the freedom of speech, or of the press**; or right of the people to assemble, and to petition the Government for a redress of grievances". (Énfasis suplido). *Íd.*

A.

i.

Expuesto lo anterior, precisa señalar aquí que son múltiples los debates que se han generado sobre la importancia de la libertad de expresión consagrada en la Primera Enmienda de la Constitución federal, *supra,* los grados de protección que de ésta emanan y los métodos de análisis que, para ello, deben emplearse.[7] Con relación a los asuntos que nos ocupan, una de esas controversias estriba, precisamente, en si la fuente confidencial que suministra información a los medios de comunicación queda protegida por vía del derecho a la libertad de prensa.[8] Dicho de otro modo, si debe reconocerse un privilegio periodista-fuente por imperativo constitucional; asunto que -- por décadas -- ha sido ampliamente abordado por los tribunales estadounidenses.[9]

---

[7] Véase, J. J. Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. TEMIS, 2009, pág. 972; R. Serrano Geyls, *op. cit.*, págs. 1273-1274.

[8] Véase, *Informe de la Conferencia judicial sobre el Privilegio del Periodista*, 42 (Núm. 2) REV. COL. ABOG. PR 51, 51-52 (1981); R. Serrano Geyls, *op. cit.*, págs. 1561, 1579-1589.

[9] Se ha argumentado que el caso *Garland v. Torres*, 259 F.2d 545 (1958), una demanda por difamación e incumplimiento de contrato, fue el primer pleito judicial en el que una columnista invocó sus derechos al amparo de la Primera Enmienda de la Constitución federal para rehusarse a revelar su fuente confidencial. En esa ocasión, el Juez Steward, entonces juez del Segundo Circuito de Apelaciones, resolvió que ni la Primera Enmienda de la Constitución de Estados Unidos sobre libertad de prensa, ni ley evidenciaria alguna, confería a una periodista el derecho a rehusarse a responder preguntas relacionadas con la identidad de una fuente confidencial. Sin embargo, éste rechazó que el descubrimiento de la fuente confidencial se hiciera de manera automática. Sobre ello, expresó que "compulsory disclosure of a journalist's confidential sources of information entails an abridgment of press freedom by imposing some limitation upon the availability of news." *Íd.*, pág. 548.

A tales efectos, sugirió que su visión sobre el derecho a la libertad de prensa -- vital para las sociedades libres--, era que éste no se catalogaba como un derecho absoluto, sino cualificado. En ese sentido,

Fue, precisamente, en *Branzburg v. Hayes*, 408 U.S. 665 (1972), -- un caso que se da en el contexto de determinado proceso criminal, distinto al caso que nos ocupa cuyas controversias nacen dentro de cierto proceso civil --, donde el Tribunal Supremo de Estados Unidos, por vez primera, se enfrentó a esa controversia. En dicho caso, la Corte venía obligada a responder si, a ciertos periodistas compelidos a testificar sobre la investigación de un crimen ante un gran jurado, les cobijaba el privilegio de no divulgar la fuente de información confidencial, al amparo de la Primera Enmienda de la Constitución federal.

Al atender esta interrogante, el Máximo Foro Judicial federal consolidó cuatro (4) casos, a saber: dos del estado de Kentucky, uno de Massachusetts y otro de California. Los casos de referencia tenían en común que, durante la etapa investigativa, un gran jurado había citado a determinados periodistas para que respondieran ciertas preguntas en un proceso criminal. Particularmente, para que identificaran a las personas descritas en sus reportajes por presuntamente

---

sostuvo que "[w]hat must be determined is whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom." *Íd*.

Al emprender esa tarea, el Juez Steward concluyó que, en ese caso, no se justificaba una protección constitucional a la columnista para que se rehusara a descubrir la identidad de la fuente confidencial, pues ésta era una prueba relevante y material que iba al corazón de la reclamación ante su consideración (**"heart of the plaintiff's claim"**). (Énfasis suplido). *Íd*., pág. 549-550. Un año más tarde, el 5 de mayo de 1959 para ser exactos, el Juez Steward fue confirmado como Juez Asociado en la Corte Suprema federal. Véase, https://www.oyez.org/justices/potter_stewart, (última visita, 18 de agosto de 2022).

tratarse de productores de drogas y de miembros del grupo conocido como los Black Panthers Party. *Íd.*, págs. 667-677.

Ante ese panorama fáctico, el Tribunal Supremo de Estados Unidos, en una cerrada votación de cinco a cuatro (5-4), emitió su Opinión por voz del Juez White. En ésta, de entrada, el referido jurista -- al hablar en nombre del Tribunal --, a pesar de sentenciar que el uso de fuentes confidenciales por la prensa no está ni permitido ni prohibido, por lo que la prensa era libre de recibir o recopilar información mediante cualquier medio y dentro del marco de la ley ("[t]he use of confidential sources by the press is not forbidden or restricted; reporters remain free to seek news from any source by means within the law. No attempt is made to require the press to publish its sources of information or indiscriminately to disclose them on request."); rechazó reconocer que la Primera Enmienda de la Constitución de Estados Unidos proveía un privilegio para eximir a los periodistas de responder preguntas sobre la investigación de un crimen a un gran jurado. *Íd.*, págs. 681-682.

Tras repasar las distintas instancias en las que se ha limitado el alcance de la libertad de prensa por razón de un interés público sustancial,[10] el Tribunal Supremo de Estados Unidos expresó que no debía sorprender que los periodistas tuvieran la obligación de comparecer ante un gran jurado y

---

[10] Véase, *Branzburg v. Hayes*, *supra*, págs. 683-685.

responder preguntas relacionadas con una investigación criminal ("[i]t is thus not surprising that the great weight of authorities that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to criminal investigation").[11] *Íd.*, pág. 687. A juicio de la mayoría, y dado a que los periodistas citados en los casos consolidados figuraban como testigos por haber presenciado determinados actos criminales, "concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium, and we decline now to afford it First Amendment protection by denigrating the duty of a citizen, whether reporter or informer, to respond to grand jury subpoena and answer relevant questions." *Íd.*, pág. 697. Así también, añadió que esas fuentes de información no gozan de protección constitucional alguna. *Íd.*, pág. 698.

En esa línea, el Máximo Foro Judicial federal destacó que la función investigativa de un gran jurado -- la cual se presume es de buena fe -- en el sistema procesal penal, su rol fundamental para procurar la seguridad de la ciudadanía y su histórica autoridad para citar testigos, suponen un interés o necesidad apremiante del estado que justifica una limitación indirecta a los derechos consagrados en la Primera

---

[11] **Desde el inicio de la Opinión, el Foro federal de referencia dejó claro que el único asunto ante su consideración era la obligación de los periodistas de responder a la citación de un gran jurado, tal y como lo debía hacer cualquier otro ciudadano u otra ciudadana, para responder preguntas relevantes a una investigación sobre la comisión de ciertos delitos criminales** ("[t]he sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime"). *Branzburg v. Hayes*, *supra*, pág. 682.

Enmienda de la Constitución federal. *Íd*., págs. 686-688, 700. **Al respecto, concluyó que el privilegio del periodista era condicional o cualificada y no absoluto.** *Íd*., pág. 702. Es decir, que el privilegio del periodista podía reconocerse de manera limitada.

Sobre el particular, el Tribunal Supremo de Estados Unidos añadió que la adopción de una regla del privilegio condicionado, si bien reduciría las instancias en las que un periodista sería citado a testificar ante un gran jurado, aún no lograba anticipar las circunstancias en las que sí estaría obligado a comparecer ("[p]resumably, such a rule would reduce the instances in which reporters could be required to appear, but predicting in advance when and in what circumstances they could be compelled to do so would be difficult"). *Íd*.

**Por último, en el referido caso el Máximo Foro Judicial federal dejó la puerta abierta para que el Congreso, las legislaturas de cada estado o, inclusive, los tribunales estatales reconocieran el privilegio del periodista de forma absoluta o cualificada de conformidad con sus propias constituciones.** En palabras de ese Tribunal:

> [a]t the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate. There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light

> of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute. *Íd.*, pág. 706.

Dicho ello, y en aras de completar el análisis de la mencionada Opinión, es menester señalar que el Juez Powell -- quien fue el voto decisivo para la Opinión mayoritaria en *Branzburg v. Hayes*, *supra* --, emitió una breve Opinión concurrente, muy ilustrativa, por cierto, a los únicos fines de enfatizar lo que, a su juicio, debían ser los contornos de la determinación emitida por el Tribunal Supremo de Estados Unidos en el referido caso. Los explicamos.

En primer lugar, en su Opinion concurrente el Juez Powell destacó que un periodista no debía quedarse sin remedio alguno cuando entendía que la investigación de un gran jurado no era conducida de buena fe. Así pues, para esos escenarios, propuso un análisis de balance entre el derecho de la libertad de prensa y el interés público en obligar a la ciudadanía a comparecer para dar testimonios relevantes a conductas criminales; análisis que debía emplearse caso a caso. Puntualmente, el referido jurista expresó que:

> no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source

> relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions. *Íd.*, págs. 709-710 (Powell, Opinión concurrente).

Por su parte, y abundando en el análisis de lo resuelto por el Tribunal Supremo de Estados Unidos en *Branzburg v. Hayes*, *supra*, debemos también mencionar que el Juez Stewart emitió una Opinión disidente a la cual se unieron los jueces Brennan y Marshall. En su escrito, el mencionado jurista abogó por el reconocimiento de un derecho constitucional a la protección de las fuentes confidenciales al expresar que:

> [t]he reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a full and free flow of information to the public. It is this basic concern that underlies the Constitution's protection of free press because the guarantee is 'not for the benefit of the press so much as for the benefit of all of us'. *Íd.*, pág. 726 (Stewart, Opinión disidente).

El Juez Stewart, propuso también una **visión cualificada del privilegio del periodista** como corolario del derecho de la prensa a recopilar y recibir información, al argumentar que los oficiales del gobierno podrán rebatir el referido privilegio si logran demostrar que: 1) la información solicitada es claramente relevante para el objeto de la investigación gubernamental definido con precisión; 2) existe

una creencia razonable de que el testigo en cuestión tiene esa información, y 3) no existe otro mecanismo o medio menos lesivo a los derechos consagrados en la Primera Enmienda de la Constitución de Estados Unidos para recopilar la información. *Íd.*, pág. 740.[12]

A su vez, y por igual en el contexto de *Branzburg v. Hayes*, *supra*, debemos resaltar que el Juez Douglas también emitió una Opinión disidente. En ésta, planteó que el privilegio del periodista debió reconocerse como un derecho absoluto, pues, a su modo de ver, el balance requerido ya se había realizado al redactar la Carta de Derechos ("[m]y belief is that all of the 'balancing' was done by those who wrote the Bill of Rights"). *U.S. v. Caldwell*, 408 U.S. 665, 92 S.Ct. 2686 (1972) (Douglas, Opinión disidente). Con igual tono, señaló que la determinación mayoritaria tenía el efecto de reducir el libre flujo de información debido al temor que causaba tanto en la fuente como en la prensa ("[f]orcing a reporter before a grand jury will have two retarding effects upon the ear and the pen of the press. Fear of exposure will cause dissidents to communicate less openly to trusted reporters. And, fear of accountability will cause editors and critics to write with more restrained pens"). *Íd.*, pág. 721.

---

[12] Al analizar la Opinión Concurrente del Juez Powell junto a la mayoritaria y a la disidencia, se ha comentado que "*Branzburg* may thus have not been a five-to-four decision at all, but rather a decision "by a vote of four and a half to four and a half." 3 R.A. Smolla, *Smolla & Nimmer on Freedom of Speech,* sec. 25:22 (Abril 2022), citando a P. Stewart, *Or of the Press*, 26 Hastings LJ 631, 635 (1975).

Así las cosas, tras lo expresado por el Máximo Foro Judicial federal en *Branzburg v. Hayes*, *supra*,[13] han sido múltiples las jurisdicciones de Estados Unidos -- en concreto, cuarenta (40) estados y el Distrito de Columbia -- que han promulgado lo que se conoce como leyes escudo (*shield laws*), a los fines de reconocer el privilegio del periodista. Véase, O. J. Serrano, *Espada sin escudo: la necesidad de proteger las fuentes periodísticas*, 48 Rev. Jur. UIPR 9, 10 (2013-2014).[14] **En su mayoría, los estados que han reconocido el privilegio del periodista lo han hecho de manera cualificada tanto en litigios de naturaleza civil como criminal.** Véase, *B. Kensworthy*, State Shield Statutes & Leading Cases, Freedom Forum Institute, 2011, https://www.freedomforuminstitute.org/first-amendment-center/topics/freedom-of-the-press/state-shield-statutes-leading-cases/ (última visita, 18 de agosto de 2022). **Llama la atención, además, que los estados que <u>no</u> han aprobado una ley escudo tienden a reconocer el privilegio del periodista cualificadamente en la jurisprudencia local; bien sea por**

---

[13] Cabe mencionar que, a la fecha, el referido Foro federal aún no ha revisado su dictamen en *Branzburg v. Hayes*, *supra.* Esto, a pesar de que, desde la certificación del mencionado caso, se han generado innumerables debates, múltiples leyes estatales y diversos litigios sobre el particular.

[14] Citando a Aaron Mackey, *Number of states with shield law climbs to 40*, 35 The News Media & The Law (magazine of Reporter's Committee for Freedom of the Press) 27 (Summer 2011) https://www.rcfp.org/journals/news-media-and-law-summer-2011/number-states-shield-law-cl/.

**imperativo constitucional y/o mediante la aplicación del análisis de buena fe y de balance de intereses.**[15]

ii.

Establecido lo anterior, debemos destacar que, no empece a que sí lo ha hecho en el contexto de pleitos criminales, el Tribunal Supremo de Estados Unidos no se ha pronunciado respecto a si, **en el contexto de un pleito civil de libelo –** – recordemos que el caso de *Branzburg v. Hayes*, *supra*, era uno de naturaleza penal --, puede un periodista negarse válidamente a revelar la fuente de confidencial, ni cuáles

---

[15] Véase, por ejemplo, **State v. Siel,** 122 N.H. 254, 259 (N.H. 1982) "[T]he New Hampshire Constitution, part 1, article 22, provides a qualified privilege for reporters in civil cases …. We do not believe that, in a criminal case, this State constitutional privilege must cease to exist. But because the individual citizen's civil rights must also be protected, 'a news reporter's privilege is more tenuous in a criminal proceeding than in a civil case.'"; **State v. St. Peter,** 132 Vt. 266, 271 (Vt. 1974) "[W]e hold that, when a newsgatherer, legitimately entitled to First Amendment protection, objects to inquiries put to him in a deposition proceeding conducted in a criminal case, on the grounds of a First Amendment privilege, he is entitled to refuse to answer unless the interrogator can demonstrate to the judicial officer appealed to that there is no other adequately available source for the information and that it is relevant and material on the issue of guilt or innocence."; **Brown v. Commonwealth,** 214 Va. 755, 757 (Va. 1974) "We believe that, as a news-gathering mechanism, a newsman's privilege of confidentiality of information and identity of his source is an important catalyst to the free flow of information guaranteed by the freedom of press clause of the First Amendment. Unknown at common law, it is a privilege related to the First Amendment and not a First Amendment right, absolute, universal, and paramount to all other rights … we think the privilege of confidentiality should yield only when the defendant's need is essential to a fair trial."; **State ex rel. Classic III v. Ely,** 954 S.W.2d 650, 655 (Mo. App. 1997) "We adopt the balancing test …. In so doing, however, we emphasize that the trial court must undertake this balancing test only if the journalist invokes a reporter's shield privilege based on a promise of confidentiality to his or her source."; **In re Contempt of Wright,** 108 Idaho 418, 422 (Idaho 1985) "To the extent that Caldero (a 1977 libel action appealed to the Idaho Supreme Court) holds that under no circumstances is there a qualified newsperson's privilege in Idaho which is protected by the First Amendment of the U.S. Constitution, we decline to follow it as precedent. Since Caldero there has been an increasing recognition by federal and other state courts, as well as state legislatures which have passed "shield laws", of the connection between freedom of the press and the public's right to know. A careful balancing by the courts between a First Amendment privilege, and any interest asserted which may conflict with that privilege, will serve the parties and the public most appropriately.".

factores o criterios deberán o no evaluarse para responder a esa interrogante. Sin embargo, queda claro que, a nivel de los tribunales apelativos federales y cortes estatales, existe una marcada inclinación a reconocer de manera cualificada el privilegio del periodista en los casos civiles. De igual forma, existe un amplio conceso en aplicar el análisis de buena fe y balance de intereses abordado por el Juez Powell en la Opinión concurrente a la que hemos hechos referencia, así como con examinar tres factores: 1) que la información fue publicada, y es falsa y difamatoria; 2) que se emplearon esfuerzos razonables para descubrir la fuente por otros medios, y 3) que la identificación de la fuente es necesaria para prepararse y presentar el caso de forma apropiada.

Al respecto, nos comenta el tratadista Rodney A. Smolla que:

> [i]n the aftermath of *Branzburg* many lower courts, relying on the concurring opinion of Justice Powell, have assumed that there is a First Amendment reporter's privilege. […] There is authority for the proposition that a qualified privilege is certainly available in civil cases, because *Branzburg* does not control at all outside the criminal justice context. These decisions generally employ some form of balancing test, elaborating on the language in Justice Powell's *Branzburg* concurrence. **The balancing tests employed usually emphasize such factors as the relevancy of the evidence, the possibility that the evidence could be obtained through alternative means, and whether there is a compelling interest in the information.** (Citas omitidas y énfasis suplido). 3 R. A. Smolla, *Smolla & Nimmer on Freedom of Speech,* sec. 25:26 (Abril, 2022).

A modo de ejemplo, el Octavo Circuito, en *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972), -- durante el mismo año que se publicó *Branzburg v. Hayes*, *supra*, -- avaló la aplicabilidad del privilegio del periodista de manera cualificada en cierta reclamación de libelo al exponer que, en ese caso resultaba incensario descubrir la fuente de información confidencial, pues el demandante no probó que ello era necesario para adelantar su causa de acción. Con igual razonamiento, más adelante, el Segundo Circuito, en *Baker v. F&F Investment*, 470 F.778, 16 Fed. R. Serv. 2d 945 (2d Cir. 1972), endosó el privilegio del periodista cualificadamente en las causas de acciones civiles, en la medida en que sentenció que la parte que desea descubrir la identidad de la fuente podrá derrotar el privilegio si acredita la existencia de una necesidad apremiante ("overriding and compelling") de la información.

Años más tarde, en *Miller v. Transamerica Press, Inc.*, 621 F.2d 721, (5th Cir. 1980), -- un caso sobre libelo presentado por una figura pública en donde, en la etapa del descubrimiento de prueba, los autores de un artículo se negaron a revelar la fuente de información por tener un acuerdo de confidencialidad con ésta --, el Quinto Circuito, resolvió que la fuente debía ser descubierta. No obstante, el foro apelativo intermedio de referencia precisó que, si bien reconocía la existencia del privilegio del periodista que protege la negativa de revelar la fuente de información

confidencial, dicho privilegio no era absoluto y, en escenarios como el que tenía ante su consideración, debía ceder ("[w]e hold that a reporter has a First Amendment privilege which protects the refusal to disclose the identity of confidential informants, however, the privilege is not absolute and in a libel case as is here presented, the privilege must yield."). *Íd.*, pág. 725. Sobre ello, apuntó que "[a]s the Supreme Court observed Herbert v. Lando: 'Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances.' (99 S.Ct. at 1648)." *Íd.* Posteriormente, ese mismo foro publicó un suplemento al precitado caso en donde dejó en extremo claro su dictamen al exponer que:

> **[w]e do not mean to intimate that a plaintiff will be entitled to know the identity of the informant merely by pleading that he was injured by an untrue statement.** Before receipt of such information the **plaintiff must show:** substantial evidence that the challenged statement **was published** and **is both factually untrue and defamatory;** that reasonable efforts to discover the information from **alternative sources** have been made and that no other reasonable source is available; and that knowledge of the identity of the informant **is necessary** to proper preparation and presentation of the case. From our review of the record, we are satisfied that all of these requirements have been met. (Énfasis nuestro). *Miller v. Transamerican Press, Inc.,* 628 F.2d 932 (5th Cir. 1980).

En un caso también de libelo, *Zerilli v. Smith*, 656 F.2d 705 (1981), el Circuito para el Distrito de Columbia, sentenció que, luego de examinar las distintas opiniones emitidas en en *Branzburg v. Hayes*, *supra*, -- con énfasis en

lo expuesto por el Juez Powell su Opinión concurrente --, así como las determinaciones de otros circuitos,[16] el interés en proteger a las fuentes de la prensa, en litigios como el que tenía ante su consideración, superaba el interés planteado por el demandante y su solicitud para revelar la referida fuente de información confidencial. Particularmente, expresó que: "[i]n general, when striking the **balance** between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources, we will be mindful of the preferred position of the First Amendment and the importance of a vigorous press. […] Thus in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." (Énfasis suplido). *Íd.*, pág. 712. Cónsono con lo anterior, aseguró que la orden para descubrir la fuente de información, en ninguna circunstancia, debía ser concedida de manera automática en las acciones sobre libelo ("disclosure should by no means be automatic in libel cases."). *Íd.*, pág. 714.

---

[16] "Every other circuit that has considered the question has also ruled that a **privilege should be readily available in civil cases, and that a balancing approach should be applied.** See Riley v. City of Chester, 612 F.2d 708, 715-716 (3d Cir. 1979) (upholding assertion of privilege); Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 436-438 (10th Cir. 1978) (same); Baker v. F & F Investment, supra, 470 F.2d at 783 (same); Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972) (same); Miller v. Transamerican Press, Inc., 621 F.2d 721, 725 (5th Cir. 1980) (ruling that privilege does not prevail); see also Democratic Nat'l Committee v. McCord, 356 F.Supp. 1394, 1398 (D.D.C.1973) (upholding privilege); Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co., 455 F.Supp. 1197, 1203 (N.D.Ill.1978) (same); Altemose Construction Co. v. Building & Construction Trades Council of Philadelphia, 443 F.Supp. 489, 491 (E.D.Pa.1977) (same); Gilbert v. Allied Chemical Corp., 411 F.Supp. 505, 508 (E.D.Va.1976) (same)." (Énfasis suplido). *Íd.*, pág. 712.

De manera muy similar a los precitados casos, el Undécimo Circuito, entrado el siglo XXI, en *Price v. Time, Inc.* 416 F.d 1327 (11th Cir. 2005), dictó que el privilegio del periodista existe y debe ser analizado bajo los tres factores establecidos en *Miller v. Transamerica Press, Inc.*, *supra*. En palabras del referido foro apelativo intermedio: "[w]e think a full discussion of the *Miller* decision is worthwhile, because the issues in that case closely parallel those in this one and that decision is binding precedent." *Íd.*, pág. 1343.

Por su parte, el Primer Circuito, del cual la jurisdicción de Puerto Rico forma parte, en *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 715 (1st Cir. 1998), un caso antimonopolístico, denegó la solicitud presentada por una de las partes para que se revelara la fuente al reconocer el privilegio del periodista cualificado, aun cuando ésta resultara relevante. También resolvió que, la fuente confidencial en cuestión podía identificarse por otros medios. *Íd.*, pág. 717.

Más reciente, ese mismo foro apelativo intermedio, en *In re Request from United Kingdom*, 718 F.3d. 13, (1st Cir. 2013), reconoció el valor del análisis de balance al manifestar que: "[a] balancing of First Amendment concerns vis-à-vis the concerns asserted in favor of the compelled disclosure of academic and journalistic information is the law in this circuit for all First Amendment cases and, as explained in

our analysis above, 'at least in situations distinct from *Branzburg,*' there is room for courts to require direct relevance. In fact, in *Branzburg,* the Supreme Court indeed performed, albeit *sub silentlo,* a balancing test in evaluating the First Amendment challenge raised by the reporters." *Íd.,* págs. 25-26.

iii.

En Puerto Rico no existe legislación referente a una *ley escudo,* -- como tampoco un reconocimiento judicial expreso del privilegio del periodista --, aunque han sido varios los proyectos que se han presentado a esos fines. En el año 1981, por ejemplo, el Secretariado de la Conferencia Judicial, adscrito a este Tribunal, publicó un *Informe* sobre el privilegio del periodista. *Informe del Secretariado de la Conferencia Judicial sobre el privilegio del periodista*, 42 (Núm. 2) REV. COL. ABOG. PR 51 (1981). Dicho *Informe* se realizó a petición de las Comisiones de lo Jurídico de la Cámara de Representantes como el Senado de Puerto Rico "para ser considerado en la discusión de las Reglas de Evidencias adoptadas por el Tribunal Supremo […] y remitidas a la Asamblea Legislativa". *Íd.,* pág. 51. La intención fue, evaluar la posibilidad de incluir el privilegio del periodista al precitado cuerpo reglamentario. *Íd.*

En el *Informe*, el Secretariado de la Conferencia Judicial concluyó que:

> en el presente informe se ha dado la trayectoria histórica y jurisprudencial en torno a la

protección de la fuente de información del periodista, se ha suplido información en relación con la legislación más reciente adoptada por las diferentes jurisdicciones de los Estados Unidos, señalado las tendencias y los problemas prácticos que presenta la redacción de legislación estableciendo un privilegio al periodista y se han señalado alternativas a la legislatura a tales efectos.

El contenido del privilegio debe quedar sujeto a la política pública que desee establecer la Asamblea Legislativa, ya sea mediante la creación de un privilegio absoluto o de un privilegio cualificado donde se establezca un balance entre los posibles intereses en conflicto. A nuestro entender, cualquier medida que se adopte en protección de la fuente de información del periodista, debe ser no limitativa, sino en el más amplio resguardo de las disposiciones constitucionales a [las] que hemos hecho referencia. *Íd.*, pág. 73.

Empero, lo anterior no produjo resultados legislativos. Por ello, a la fecha se han impulsado distintos esfuerzos para que la Asamblea Legislativa apruebe alguna medida que incluya el privilegio del periodista en nuestros estatutos.[17]

---

[17] Actualmente están ante la consideración de la Asamblea Legislativa de Puerto Rico los proyectos de ley siguientes:

P de la C 1193: Para establecer la "Ley del escudo periodístico en Puerto Rico" con el fin de proteger el privilegio de periodistas y medios de comunicación de no revelar sus fuentes y limitar la facultad de entidades gubernamentales de utilizar mecanismos para compeler la divulgación de las mismas; añadir una nueva Regla 516 de Evidencia, a fin de establecer el privilegio del periodista y medios de comunicación de no divulgar sus fuentes, enmendar las Reglas 517 y 518, y reenumerar las Reglas 516, 517 y 518, como las Reglas 517, 518 y 519 de las Reglas de Evidencia de Puerto Rico, según enmendadas. Véase, P de la C 1193, 19na Asamblea Legislativa, 3era Sesión Ordinaria (3 de febrero de 2022).

P de la S 734: Para establecer la "Ley para la Protección de Fuentes Periodísticas" a los fines de que los periodistas o reporteros en Puerto Rico no sean obligados a revelar la identidad de cualquiera de sus fuentes de información confidenciales ni sean sancionados por negarse a revelarlas, establecer penalidades y causas de acción en protección al periodista, medio de comunicación o fuente; y para otros fines. Véase, P de la S 734, 19na Asamblea Legislativa, 3ra Sesión Ordinaria (24 de enero de 2022).

Desde entonces esos esfuerzos continúan siendo reclamados por distinto sectores de la población.[18]

**Ahora bien, el hecho de que no tengamos una ley escudo, no es impedimento para que, -- similar a como lo hemos hecho en otras ocasiones --, en nuestra función de ser los últimos intérpretes de la Constitución, reconozcamos, por primera vez, el privilegio del periodista de manera cualificada en**

---

P de la S 743: Para añadir la nueva Regla 517 a las Reglas de Evidencia de Puerto Rico, según enmendadas, y reenumerar las actuales Reglas 517 y 518, como 518 y 519, respectivamente, a los fines de establecer el Privilegio del Reportero, para que cualquier persona editora, reportera, presentadora de noticias empleada o exempleada, u otra persona relacionada o empleada en un periódico, revista, agencia de noticias u otra publicación periódica, o por una asociación de prensa, servicio de cable, red de transmisión de radio o televisión, o cualquier persona que haya estado relacionada o empleada, no pueda ser declarada en desacato por un organismo judicial, legislativo, administrativo o cualquier otro organismo que tenga el poder de emitir citaciones, por negarse a revelar, en cualquier procedimiento, la fuente de cualquier información obtenida mientras estaba conectada o empleada para publicación en un periódico, revista u otra publicación periódica, o por negarse a divulgar cualquier información publicada o no publicada obtenida o preparada en la recopilación, recepción o procesamiento de información para su comunicación al público. Véase, P de la S 743, 19na Asamblea Legislativa, 3era Sesión Ordinaria (3 de febrero de 2022). Debe mencionarse que, tan reciente como el pasado lunes 15 de agosto de 2022, el Senado de Puerto Rico aprobó esta medida legislativa, la cual ahora será evaluada por el Cámara de Representantes. Véase, El Nuevo Día, *Senado aprueba medida para proteger el privilegio de confidencialidad de las fuentes periodísticas*, https://www.elnuevodia.com/noticias/legislatura/notas/senado-aprueba-medida-para-proteger-el-privilegio-de-confidencialidad-de-las-fuentes-periodisticas/(última visita, 18 de agosto de 2022)

Anteriormente, en los años 1978, 1986 y 2005 para ser precisos, ambos cuerpos legislativos presentaron medidas a esos fines. Véase, P de C 859, (21 de septiembre de 1978); P de la C 662, (27 de enero de 1986); P de la S 1019, 15ta Asamblea Legislativa, 2da Sesión Ordinaria (11 de octubre de 2005); P de la S 1611, 15ta Asamblea Legislativa, 4ta Sesión Ordinaria (29 de agosto de 2005).

[18] Véase, O. J. Serrano, *Espada sin escudo: la necesidad de proteger las fuentes periodísticas*, 48 Rev. Jur. UIPR 9, 10 (2013-2014; E. Pérez Jimenez, *El derecho constitucional del periodista a no divulgar sus fuentes de noticias y el contenido de la información recopilada*, 9 Rev. Jur. UIPR 101 (1974); A. Rodríguez Hernández, *Debe reconocerse privilegio del periodista y su fuente de información en Puerto Rico*, 54 Rev. Jur. UPR 735 (1985). Véase también, Julio Fontanet, *Urgen los "estatutos escudo" para el periodismo*, El Nuevo Día, 3 de febrero de 2022, en https://www.elnuevodia.com/opinion/punto-de-vista/urgen-los-estatutos-escudos-para-el-periodismo/ (última visita, 18 de agosto de 2022).

**nuestro ordenamiento jurídico, ello, al amparo del Artículo II, Sección 4, de nuestra Constitución, *supra*.**[19] Véase, *Arroyo v. Rattán Specialties*, 117 DPR 35 (1986); *Soto v. Secretario de Justicia*, 112 DPR 477 (1982); *Figueroa Ferrer v. ELA Figueroa*, 107 DPR 250 (1978). **Recordemos que nuestra Constitución es fuente de privilegios, y así como los crea puede limitar su alcance "cuando su aplicación está reñida con un derecho fundamental".** *Pueblo v. Fernández Rodríguez*, 183 DPR 770, 783 (2011).

Al aproximarse a este tema, el Profesor Ernesto Chiesa Aponte, en su obra *Tratado de Derecho Probatorio*, llama la atención a la existencia de privilegios -- adicionales a los contemplados en nuestras Reglas de Evidencia -- que están en "desarrollo o reconocidos en otras jurisdicciones, algunos con cierta base constitucional, como el privilegio del periodista". E.L. Chiesa Aponte, *Tratado de Derecho Probatorio*, San Juan, Ed. JTS, (s. año), T.I, pág. 317. En esa línea, éste nos menciona que los privilegios se reconocen para excluir evidencia que, aunque pertinente, se sacrifica de manera justificada para adelantar un alto interés público, así "mientras más alto sea el interés público que se quiere adelantar con el privilegio, mayor será su alcance y menor las excepciones al privilegio" y viceversa. E. L. Chiesa

---

[19] En *Asoc. de Periodistas v. González*, 127 DPR 704 (1991), esta Curia rehusó atender en los méritos la referida pregunta en el contexto de una citación a varios periodistas como testigos en un proceso criminal, por entender que el caso se había tornado académico. Véase, también, J.J. Álvarez González, *op. cit.*, pág. 1182-1183.

Aponte, *Reglas de Evidencia de Puerto Rico 2009*, San Juan, Ed. JTS, 2009, pág. 149.

iv.

Por último, cabe mencionar aquí que, en el contexto internacional, el privilegio del periodista también ha sido ampliamente reconocido. Así, por ejemplo, el Artículo 10 de la Convención Europea de Derechos Humanos que trata sobre el derecho a la libertad de expresión establece que:

> 1. Toda persona tiene derecho a la libertad de expresión. Este derecho comprende la libertad de opinión y la libertad de recibir o de comunicar informaciones o ideas, sin que pueda haber injerencia de autoridades públicas y sin consideración de fronteras. El presente artículo no impide que los Estados sometan a las empresas de radiodifusión, de cinematografía o de televisión a un régimen de autorización previa. 2. El ejercicio de estas libertades, que entrañen deberes y responsabilidades, podrá ser sometido a ciertas formalidades condiciones, restricciones o sanciones previstas por la ley, que constituyan medidas necesarias, en una sociedad democrática, para la seguridad nacional, la integridad territorial o la seguridad pública, la defensa del orden y la prevención del delito, la protección de la salud o de la moral, la protección de la reputación o de los derechos ajenos, **para impedir la divulgación de informaciones confidenciales** o para garantizar la autoridad y la imparcialidad del poder judicial. (Énfasis suplido). Art. 10 de la Convención Europea de Derechos Humanos, en https://www.echr.coe.int/documents/convention_spa.pdf (última visita, 18 de agosto de 2022).

Amparada en la precitada disposición, la Corte de Derechos Humanos de la Unión Europea ha sentenciado en reiteradas ocasiones que obligar a un periodista a revelar la identidad de su fuente en determinados escenarios infringe la misma. Véase, por ejemplo, *Financial Times Ltd and Others v.*

*the United Kingdom*, judgment of 15 December 2009; *Voskuil v.*

*the Netherlands*, judgment of 22 November 2007*; Goodwin v. the*

*United Kingdom*, judgment of 27 March 1996. En este último, --

-- un caso sobre una orden impuesta a un periodista del medio

*The Engineer* para que describiera la identidad de su fuente

de información relacionada con un plan corporativo

confidencial --, la Corte de referencia sentenció que:

> **[p]rotection of journalistic sources is one of the basic conditions for press freedom, as is reflected in the laws and the professional codes of conduct in a number of Contracting States and is affirmed in several international instruments on journalistic freedoms** (see, amongst others, the Resolution on Journalistic Freedoms and Human Rights, adopted at the 4th European Ministerial Conference on Mass Media Policy (Prague, 7-8 December 1994) and Resolution on the Confidentiality of Journalists' Sources by the European Parliament, 18 January 1994, Official Journal of the European Communities No. C 44/34). **Without such protection, sources may be deterred from assisting the press in informing the public on matters of public interest.** As a result the vital public-watchdog role of the press may be undermined and the ability of the press to provide accurate and reliable information may be adversely affected. **Having regard to the importance of the protection of journalistic sources for press freedom in a democratic society and the potentially chilling effect an order of source disclosure has on the exercise of that freedom,** such a measure cannot be compatible with Article 10 (art. 10) of the Convention unless it is justified by an overriding requirement in the public interest.
>
> These considerations are to be taken into account in applying to the facts of the present case the **test of necessity** in a democratic society under paragraph 2 of Article 10 (art. 10-2). (Énfasis suplido). *Goodwin v. the United Kingdom*, judgment of 27 March 1996, § 39).

Con un enfoque similar, la Declaración de Principios sobre Libertad de Expresión de la Comisión Interamericana de Derechos Humanos dispone, en el Principio 8, que "[t]odo comunicador social tiene derecho a la reserva de sus fuentes de información, apuntes y archivos personales y profesionales". Véase, Comisión Interamericana de Derechos Humanos, *Declaración de Principios sobre Libertad de Expresión*, en https://www.cidh.oas.org/Basicos/Basicos13.htm (última visita, 18 de agosto de 2022).

v.

**En fin, luego de examinar el desarrollo jurisprudencial y estatutario en la materia que nos ocupa, debe notarse que es el privilegio del periodista -- y no otro -- el mecanismo adecuado para protegerse de una petición de descubrimiento de prueba dirigida a revelar la fuente de información confidencial en un caso civil sobre libelo. Precisamente, de la aplicabilidad de este privilegio, trataba la controversia medular que tenía esta Curia ante su consideración.**

B.

Por otra parte, y por considerarlo extremadamente pertinente para la correcta disposición de las controversias ante nos, conviene repasar aquí algunas disposiciones de la Ley de 19 de febrero de 1902, conocida como Ley de Libelo y Calumnia, 32 LPRA secs. 3141-3149.[20] Como se sabe, el referido

---

[20] Véase, *Colón, Ramírez v. Televicentro de P.R*, 175 DPR 690, 699-715 (2009), para un recuento del origen, entrada en vigor -- hace ya más de un siglo -- y desarrollo de nuestra Ley de Libelo y Calumnia, *supra*, y

estatuto gobierna todo lo relacionado con las reclamaciones por difamación y reconoce una acción civil por daños y perjuicios a tenor con lo dispuesto en el Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5141. Véase, *Colón, Ramírez v. Televicentro de P.R*, 175 DPR 690, 702 (2009), citando a *Romany v. El Mundo*, Inc., 89 DPR 604, 617-618 (1963).

En lo que nos atañe, la Sección 4 de la referida ley establece que:

> [n]o se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. **No se presumirá que es maliciosa la publicación que se hace:**
>
> *Primero*.-En el propio desempeño de un cargo oficial.
>
> *Segundo*.**-En un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos.**
>
> *Tercero*.-A un funcionario oficial, apoyada en causa probable, con la intención de servir al procomún, o de conseguir remedio a un perjuicio hecho a un particular. (Énfasis suplido). 32 LPRA sec. 3144.

Es decir, aquel o aquella que publique un informe justo y verdadero quedará excluido de responsabilidad legal al amparo de la precitada disposición estatutaria. Véase, *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 157 (2013); *Villanueva v. Hernández Class*, *supra*.

---

las distintas doctrinas y estándares probatorios que, junto a ésta, hemos adoptado.

En el normativo caso de *Villanueva v. Hernández Class*, *supra*, -- uno de naturaleza civil sobre libelo, presentado por una maestra en contra del diario El Vocero, entre otros --, tuvimos la oportunidad de examinar si cierta noticia publicada por el periódico en cuestión estaba protegida por el privilegio del informe o reporte justo y verdadero al que se refiere la precitada Sección 4 de la Ley de Libelo y Calumnia, *supra*. Al emprender esa tarea, de entrada, afirmamos que "[e]n la solución del presente recurso nos [guió] la firme convicción de que la diseminación de información por la prensa en la forma más amplia posible resulta ser esencial para el bienestar general de nuestra ciudadanía". *Íd.*, pág. 628. Así, reiteramos que "una comunicación privilegiada [entiéndase, protegida por la Ley de Libelo y Calumnia, *supra*] es aquella que, a no ser por la ocasión o las circunstancias[,] sería difamatoria y sujeta a reclamación". *Villanueva v. Hernández Class, supra*, pág. 646, citando a *Díaz v. P.R. Ry., Lt. & P. Co.,* 63 DPR 808, 811 (1944).

Con ello en mente, señalamos que los requisitos que deben estar presentes para que se configure el privilegio del informe o reporte justo y verdadero son dos, a saber: 1) que el reporte fue *justo*, de modo que capturó la sustancia de lo acontecido y consideró el posible efecto que tendría en la mente de un(a) lector(a) u oyente promedio y 2) que lo publicado fue *cierto*, "desde el punto de vista de que --

aun cuando la información que se [brindó] en el procedimiento judicial, legislativo u oficial será inherentemente falsa o libelosa -- el reportaje o noticia publicada [será cierta] por cuanto refleja la verdad de lo expresado o acontecido en el procedimiento llevado a cabo". *Villanueva v. Hernández Class, supra*, pág. 647, citando a *Caraballo v. P.R. Ilustrado, Inc.,* 70 DPR 283 (1949). Véase, también, *Meléndez Vega v. El Vocero de PR, supra*, pág. 201-202. Con relación al segundo requisito, destacamos que, para cumplir con éste, lo publicado no tenía que ser exactamente correcto, sino que bastaba con que se haya difundido un extracto sustancial de lo ocurrido. *Villanueva v. Hernández Class, supra*, págs. 647-648.[21]

Dicho de otro modo, el privilegio del reporte justo y verdadero "protege inclusive a quien publica información falsa o difamatoria", siempre y cuando ello sea un reflejo de lo acontecido. *Íd.* Eso es así, pues la Ley de Libelo y Calumnia, *supra*, solo aplicará en la medida en que "sea compatible con los principios constitucionales que rodean la acción difamatoria". Véase, J. J. Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. TEMIS, 2009, pág. 1023,

---

[21] Citando a R. Smolla, *Law of Defamation,* Nueva York, Clark Boardman, 1986, págs. 8-37; *Schuster v. U.S. News & World Report, Inc.,* 459 F. Supp. 973 (D. Minn. 1978), confirmado en 602 F.2d 850 (8vo Cir. 1979); *Hopkins v. Keith,* 348 So. 2d 999 (1977); *Holy Spirit Ass'n, Etc. v. New York Times Co.,* 399 N.E.2d 1185, 1187 (1979).

citando a *Villanueva v. Hernández Class, supra*; *Porto y Siurano v. Bently P.R., Inc.*, 132 DPR 331 (1992).

Ahora bien, en *Villanueva v. Hernández Class, supra*, también expresamos que el privilegio del reporte justo y verdadero se pierde en aquellos escenarios en donde se publica una parte de la historia de forma parcializada o subjetiva. Véase, también, *Meléndez Vega v. El Vocero de PR, supra*, pág. 202. Lo que también ocurrirá si la parte demandante "logra probar que [la parte demandada] publicó la información actuando maliciosamente, con ánimo prevenido, con el propósito de causar daño […] o conociendo la falsedad de la información". *Villanueva v. Hernández Class, supra*, pág. 649.

Al aplicar el derecho antes esbozado a los hechos que suscitaron la controversia en *Villanueva v. Hernández Class, supra*, este Tribunal resolvió que la noticia publicada por El Vocero, la cual capturaba la sustancia de lo ocurrido y reproducía los hechos relatados en las denuncias que presentó la policía en contra de la maestra, estaba protegida por el privilegio del informe justo y verdadero. *Íd.*, págs. 649-650. Por lo tanto, sentenciamos que, al así resolver, se hacía imposible que la maestra -- "aun considerándola como persona privada" -- probara la negligencia necesaria para que prosperara su causa de acción en cuanto al periódico. *Íd.*, págs. 652-653.

Posteriormente, en *Meléndez Vega v. El Vocero de PR, supra*, tras aplicar lo pautado en *Villanueva v. Hernández*

*Class, supra*, esta Curia resolvió que las conversaciones de un abogado con la prensa no constituían las publicaciones privilegiadas a las que hace referencia la Sección 4 de la Ley de Libelo y Calumnia, *supra*, toda vez que éstas no formaban parte de un procedimiento legislativo, judicial, oficial u otro procedimiento cualquiera autorizado por ley. *Íd.*, pág. 161. Sobre el particular, este Foro advirtió que "[l]a regla que hoy adoptamos simplemente establece que si se discute el tema objeto del procedimiento legal a terceros que se encuentran fuera de éste, subsiguientemente no podrá invocarse este privilegio en ese ámbito". *Íd.*, pág. 161.

**En suma, queda claro que, en nuestro ordenamiento jurídico, el privilegio del reporte justo y verdadero opera como una defensa afirmativa que podrá alegar la parte demandada en una acción civil de libelo para liberarse de responsabilidad legal.** Véase, J. J. Álvarez González, *op. cit.*, pág. 1024. Reclamado el privilegio de referencia, corresponderá a la parte demandante probar que lo publicado no formaba parte de un procedimiento según definido en la Sección 4 de la Ley de Calumnia y Libelo, *supra*. En especial, la parte demandante deberá probar que el reporte no fue justo ni verdadero porque, más allá de la veracidad o falsedad del contenido de lo publicado, dejó de reflejar sustancialmente lo acontecido.

En cuanto al uso del término *privilegio*, el Profesor José Julián Álvarez González, en su obra *Derecho*

*Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, nos comenta que, en el contexto de pleitos por difamación, aunque puede resultar menos confuso entenderlo como una defensa, se trata más bien de una figura que proviene del derecho común anglosajón (*common-law*), cuya **única función consiste en "establecer las circunstancias en las que no se impondrá responsabilidad, aun cuando el demandante haya sufrido daños"**. (Énfasis suplido). Véase, J. J. Álvarez González, *op. cit.*, pág. 1024. Véase también, J. J. Álvarez González, *Derecho Constitucional*, 61 REV. JUR. UPR 637, 765 (1992).

Lo antes expuesto no debe quedar ajeno a las expresiones de los tribunales federales relacionadas con este privilegio.[22] Sobre todo, llama la atención lo pautado en el caso de *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978). En éste, el Tribunal Supremo de Estados Unidos decretó la inconstitucionalidad de una ley del estado de Virginia que penalizaba a terceras personas, incluyendo a los medios de comunicación, que publicaban o divulgaban información cierta -- en cuanto reflejara lo ocurrido -- relacionada con un proceso confidencial llevado a cabo por una comisión de gobierno, en ese caso, una investigación confidencial en curso sobre la conducta de un magistrado. *Íd.*

---

[22] Máxime, si recordamos que "la Asamblea Legislativa de Puerto Rico adoptó, en 1902, la Ley de Libelo y Calumnia de Puerto Rico, [para codificar] rasgos básicos del derecho común anglosajón que gobernaban en aquella época las reclamaciones por difamación". *Colón, Ramírez v. Televicentro de P.R*, *supra*, pág. 701.

En *Landmark*, *supra*, dicho Foro federal manifestó que "[w]hatever differences may exist about interpretations of the First Amendment, **there is practically universal agreement that a major purpose of that Amendment was to protect the free discursion of governmental affairs**." (Énfasis suplido). *Íd.,* pág. 838. Citando su anterior determinación en *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) -- en donde resolvió que, en una acción civil de daños, el medio de comunicación que publica información cierta que está disponible al público queda protegido por la Primera Enmienda de la Constitución federal --, el Tribunal Supremo de Estados Unidos explicó que, aunque en esta ocasión lo publicado informaba sobre una investigación confidencial en curso y alejada del escrutinio público, lo divulgado estaba igualmente protegido por las garantías de la referida disposición constitucional. *Íd.,* págs. 840-841.

Con igual tono, el Tribunal Supremo federal ha sentenciado que la Primera Enmienda de la Constitución de Estados Unidos, *supra*, protege el derecho de la prensa de publicar y comunicar información obtenida legal o ilegalmente. Véase, *Bartniki v. Vopper*, 532 U.S. 514, 527-528 (2001); *Press-Enterprise Co v. Superior Court*, 478 U.S. 1, 18 (1986); *Landmark Communications, Inc. v. Virginia*, *supra*.

Por último, y en lo relacionado con el privilegio del reporte justo y verdadero, así como a las discusiones

referentes a la vigencia de nuestra Ley de Libelo y Calumnia, *supra*,[23] nos resultan ilustradoras las expresiones del tratadista Rodney A. Smolla:

> the great landmark decisions in First Amendment history, the Supreme Court in *New York Times Co. v. Sullivan* held that traditional common law tort rules governing libel were inconsistent with many core free speech values, and had to be modified to be brought into conformity with the requirements of the First Amendment. In the years since *New York Times*, the Supreme Court has frequently revisited the area, defining the contours of First Amendment limitations on libel, invasion of privacy, and related torts.
>
> It is worth noting that while the *New York Times* decision dealt largely with the fault standards that apply to defamation law, in its aftermath **courts have frequently held that other common-law or statutory defamation doctrines may also reflect First Amendment values, and may indeed come to be understood as required by First Amendment principles. A good example is the traditional defamation "fair report" privilege which protects fair and accurate reporting of judicial proceedings. It has been suggested that the fair reports privilege may be required by the First Amendment."** (Citas en el original omitidas). (Énfasis suplido). Véase, 3 R. A. Smolla, *Smolla & Nimmer on Freedom of Speech,* sec. 23:1 (Abril, 2022).

Es, pues, a la luz de la normativa antes expuesta, que emitimos esta Opinión de Conformidad.

---

[23] Para una discusión detenida sobre el particular, véase, J. J. Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estado Unidos*, *op. cit*, pág. 1023; Alberto Bernabe-Riefkohl, *Hasta La Vista, Baby: Es Hora de Decir Adiós a La Ley De Libelo y Calumnia de 1902*, 73 Rᴇᴠ. Jᴜʀ. UPR 59 (2004); José J. Álvarez González, *Derecho Constitucional*, *op. cit.*, págs. 757-759.

III.

Como adelantamos, el presente caso resultaba ser la ocasión idónea para reconocer en nuestra jurisdicción el privilegio del periodista.

**Y es que, a lo largo de este escrito, ha quedado demostrado que el privilegio del periodista se plantea como el mecanismo apropiado para solicitarle a un tribunal que exima a la prensa de tener que descubrir la identidad de la fuente confidencial que le facilitó determinada información en una acción civil, mientras que el privilegio del reporte justo y verdadero es una defensa afirmativa que esgrime una parte demandada para liberarse de responsabilidad legal en una acción civil al amparo de la Ley de Libelo y Calumnia, *supra*.**

Es decir, si bien ambos privilegios están cimentados en los valores de la Primera Enmienda de la Constitución de Estados Unidos y nuestro Derecho Constitucional, el privilegio del periodista se ha desarrollado como una protección a las fuentes de información confidencial de los reporteros y las reporteras, y, con ello, del ejercicio eficaz de esa profesión. **En definitiva, estamos frente a privilegios independientes, y es el primero de ellos -- el privilegio del periodista -- el que, en su día, el foro primario, de determinar que la identidad de la fuente periodística es pertinente para la acción de difamación, deberá emplear para**

**poder disponer correctamente de la controversia ante su consideración.**

Ello, requerirá, sin lugar a dudas, que dicho foro realice el análisis de balance de intereses al que hemos aludido y evalúe si la parte que solicita el descubrimiento de la fuente -- entiéndase, el licenciado Torres Rodríguez -- ha presentado prueba alguna a los efectos de evidenciar que: 1) lo publicado es falso y difamatorio; 2) empleó esfuerzos razonables para descubrir la fuente confidencial por otros medios, y 3) es necesario conocer la identidad de la fuente confidencial para establecer su causa de acción.

Lo anterior, claro está, al margen de cualquier defensa, entre éstas el privilegio del reporte justo y verdadero, que en su día deberá examinar el foro primario, durante cualquier etapa del trámite procesal relacionado con la causa de epígrafe.

IV.

Establecido lo anterior, estamos conformes con la Sentencia que hoy emite este Tribunal.

Ángel Colón Pérez
Juez Asociado